

————————————

No. 3:14-CV-225-CWR-LGI

SEDRICK D. RUSSELL,

*Petitioner,*

*v.*

J. DENMARK,

*Respondent.*

————————————

MEMORANDUM OPINION AND ORDER

————————————

Before CARLTON W. REEVES, *District Judge.*

Sedrick D. Russell was convicted in the Circuit Court of Hinds County, Mississippi, of one count of aggravated assault and one count of being a felon in possession of a weapon. The trial judge sentenced him as a habitual offender to serve two concurrent life terms, without the possibility of parole, in the custody of the Mississippi Department of Corrections. In this proceeding Russell seeks federal habeas relief under 28 U.S.C. § 2254.

On review, this Court finds that the Circuit Court of Hinds County denied Russell the speedy trial he was guaranteed by the Sixth Amendment. In addition, for more than a year, Russell was completely denied access to an attorney, in violation of his right to counsel. The state court's conclusions otherwise were contrary to federal law. The writ must therefore be granted.

## I.    Background

The below facts and proceedings are drawn from *Russell v. State*, 79 So. 3d 529 (Miss. Ct. App. 2011) [hereinafter *Russell I*], the Mississippi Supreme Court's unpublished Order denying Russell's state application for post-conviction relief, Docket No. 8-2 [hereinafter *Russell II*], and the record provided to this Court by the Mississippi Attorney General's Office.

### A.    The Crime and the Alibi

On December 19, 2006, a dark, winter night at about 11:00 PM, Michael Porter was shot twice in the leg at his then-girlfriend's house in Jackson, Mississippi. He heard four shots and felt two hit his leg, but he did not see who shot him, as the shooter was somewhere behind him. No one who testified at Sedrick Russell's eventual trial saw who fired the gun.

That day in Jackson, Porter had finished his day's work at the neighborhood car repair shop, went home "for a hot second," and then went to his then-girlfriend Lawanda Hawkins' house. Lawanda's father had died. Friends and family were gathering to pay their respects.

Sedrick Russell, Lawanda's cousin, was at the house. Testimony would later establish that Lawanda's father had "told

2

Cedric to look after the house because he knew that it was a lot of shooting and burglary going on."[1]

Russell wasn't acting in a threatening manner, said Porter, the victim. Docket No. 9-3 at 96. When Porter went to the back of the house to get a cup of ice, though, Russell followed. It made Porter uncomfortable. Russell followed Porter to the porch when Porter walked outside to get some gin from his car. Porter didn't understand why. He had never had a disagreement with Russell.

When Porter reached into the front door of the car to grab the gin from the back floorboard, he was shot in the leg. No one witnessed the shooting from outside or inside.

Porter crawled into the passenger seat and sat in the car for a minute, in case the shooter was going to come around the other side of the car. He waited there until he heard Lawanda's sister, Vicki Hawkins, call his name. People in the house told Porter to get inside. Porter crawled out of the vehicle, stood up, and walked back into the house, never seeing the shooter. Vicki went outside too. She didn't see Russell, and testified that she didn't know who shot Porter. Porter was taken by ambulance to the hospital where he was treated and released.

Porter initially testified that he told police everything that occurred prior to the shooting. On the witness stand, however, he admitted that he did not inform the police that he *also* had a 9mm pistol in his car when he was shot. Vicki testified that Porter always carried a gun in his car. She added that she saw

---

[1] The record also refers to Russell as "Cedrick." The Court defaults to the way his name appears on the docket sheet.

both Porter and Russell go outside, but did not see Russell when she went outside after hearing gun shots.

Russell testified in his own defense. He said that prior to the shooting, he went on the front porch to call his friend of several years, Ron Ron, to pick him up. He saw someone come by the house and ask if Porter was inside. Then Ron Ron came and picked him up. Russell was gone before any shots were fired. He learned about the shooting the next day when his family told him the police were looking for him.

Russell was arrested on December 21, 2006. He was charged with one count of aggravated assault and one count of possession of a firearm by a convicted felon.

Russell wished to bring an alibi defense. Normally, a defendant tells his attorney about his alibi, so the attorney can properly notify the prosecution. That did not happen here. Russell could not tell his defense attorney to call Ron Ron. He didn't have an attorney! The assistant public defender who came to his preliminary hearing brushed off Russell's request to get Ron Ron to testify, telling Russell "it was just a preliminary." She never came back. Russell wasn't appointed an attorney until more than a year later, well after his trial setting had come and gone. The Court had to postpone the trial and appoint new counsel to prepare the case.

Russell tried to coordinate an alibi defense by himself. He had the phone number of Ron Ron's girlfriend's house. While incarcerated at Hinds County Detention Center waiting for his trial, Russell called that number for approximately eight months to get Ron Ron on standby to testify. However, after eight or nine months, Ron Ron and his girlfriend broke up. Ron Ron was no longer reachable at that number.

4

Eventually the court appointed another lawyer to represent him. Donald Boykin was appointed on February 14, 2008. By then, Russell had been incarcerated a jaw-dropping 14 months before speaking with a lawyer.

As soon as Boykin arrived at Hinds County Detention Center, Russell told him about Ron Ron. He told him about the disconnected phone and provided Boykin with directions of where he had been with Ron Ron, more than a year ago at this point. But it was too late; Boykin could not find Ron Ron. Russell had no one to speak on his behalf at trial. The trial court also prevented him from telling the jury about his efforts to secure Ron Ron's testimony.

### B.   Procedural History

Russell had his preliminary hearing on January 8, 2007. Assistant Public Defender Beth Davis represented Russell at the hearing—"just a preliminary."[2] The court denied bond. Russell was returned to the Hinds County Detention Center.

Nothing happened for approximately four months. Russell did not hear from Davis or anyone else in the public defender's office. On May 2, acting *pro se*, Russell filed in the Circuit Court a "Motion for Right to a Speedy and Public Trial."

Three more months passed. On August 16, a Hinds County grand jury returned a two-count indictment against Russell. Later that month, Assistant Public Defender Frank

---

[2] Unfortunately, the record does not include of transcript of Russell's preliminary hearing. We do not know what showing of probable cause was made, whether any witnesses were cross-examined, or what arguments were presented in support of Russell's release. *See* Miss. R. Crim. P. 6.2.

McWilliams filed a boilerplate motion seeking discovery from the prosecution. McWilliams had never met nor spoken to Russell.

On October 2, nine months after his preliminary hearing and still with no contact with his lawyer, Russell filed another *pro se* motion regarding a speedy trial violation. He sought to dismiss the indictment.

Russell was arraigned on November 9. Nothing in the record indicates that he was represented by counsel that day. The same day, Assistant Public Defender McWilliams refiled the boilerplate motion for discovery, perhaps unaware that he had already filed one. Who knows? He may have filed it only after learning of Russell's motion, or to make it appear that he was working diligently on Russell's case. The court set Russell's trial date for March 24, 2008.

On November 15, 2007, Russell sent the court another handwritten request. This one, styled "Petition to Grievances the Government," stated "I've been held in (11) months… suffering from mental anxiety and concern from oppressive pretrial incarceration, [sic] and **a lawyer has not yet contacted me** and provided me with the legal repersentation [sic] I need to ensure me with due process and equal protection of the law." Docket No. 9-10 at 59 (emphasis added).

On December 21, 2007, the trial judge issued a written order denying Russell's *pro se* motion to dismiss.[3] In recognition of

---

[3] The trial court's order focused exclusively on Russell's statutory right to a speedy trial. "Defendant/Petitioner's trial date is clearly within the statutory time of 270 days from the date of arraignment," it concluded. Docket 9-1, at 19. Russell's motion was not so limited, however. Although he invoked the provision of the statutory 270 rule, he also asserted that the law

6

Russell's complaint, though, the court moved Russell's trial a month earlier, to February 11, 2008. Also on December 21, perhaps unaware of the Court's ruling, Russell filed another motion asking "to submit speedy trial argument." He noted his "mental anxiety and concern from the oppressive pretrial detention." He had likely mailed it before the Court issued its ruling, but as noted below he had not received the Court's order.

Russell was displeased with the denial of his speedy trial motion. He still had no lawyer to speak for him. On December 28, he filed a document complaining about the delay. On January 7, 2008, he objected to the trial court's ruling again and begged that court for habeas relief. The court took no action on these requests.

The February 11 trial date came and went without any proceeding or contact from an attorney. As Russell put it in a February 13, 2008, "Motion to Show Cause for Delay," he says he "didn't even go to court February 11, 2008, not have to mention actually [sic] going to trial on that date, nor have a lawyer has came to visit me since my arrest which denied me due process and equal protection of the law." He concluded, begging, "I request this court to show me the cause of delaying the February 11, 2008 trial date."

That filing got the court's attention. On February 14, the trial judge issued an order replacing the public defender's office

---

"states for constitutional purposes, right to speedy trial attaches and time begins to run with arrest." *Id*. at 22-23. It is also noteworthy that the Court included Russell on the Certificate of Service, not his counsel. *Id* at 21. The implication is that the trial court at least perceived, but more likely acknowledged, that Russell's counsel was absent.

with local defense attorney Don Boykin. The court noted that the public defender's office had a "conflict of interest." Absent from the ruling was any analysis of the nature of the conflict, and to this day there has been no explanation of what the conflict was. Maybe the "conflict" was Russell's complaint that his lawyer had not met with him or talked to for more than a year while he languished in jail. Assistant Public Defender McWilliams obtained the order authorizing him to withdraw as counsel.

On February 28, 2008, 14 months after his first and only contact with an attorney, Russell had his first meeting with a committed defense attorney, Boykin. Russell immediately told Boykin about his alibi witness Ron Ron and that he had lost contact with him.

The District Attorney's Office did not immediately acknowledge that Russell had a new attorney. Five days after Boykin was appointed as counsel, the DA's Office sent its discovery responses—which had been requested in August and November 2007—not to Boykin, but to the public defender's office. It is not clear when those documents made their way to Boykin.

On March 10, the DA's Office filed a motion to amend the indictment to seek a habitual offender sentencing enhancement, stating that Russell had been previously convicted of two felony crimes, including a crime of violence. It is not clear why the prosecution added the enhancement at that time. What is clear is that Russell had been demanding a trial and an attorney.

On March 19, Boykin formally informed the prosecution that Russell intended to raise an alibi defense, in a notice

contending that at the time of the shooting, Russell was at 213 Delmar, Jackson, Mississippi.[4] Russell told Boykin he was at that house with Ron Ron. Boykin stated he had been attempting to locate Ron Ron.

On March 21, in the Response to Motion to Set Aside Order Denying Dismissal, Hinds County Assistant District Attorney Thomas Kesler conceded that the time period from Russell's arrest to February 11, 2008, should, under the *Barker* speedy trial factors, count against the state.

On March 27, three days after Russell's original trial date, Boykin filed a motion to set aside the court's speedy trial ruling, arguing that the court should dismiss the indictment for speedy trial violations.[5] He added that no attorney had communicated with Russell from the preliminary hearing of January 8, 2007, to February 28, 2008, when Boykin was able to meet Russell at Hinds County Detention Center.

Also on March 27, the court ordered a mental evaluation of Russell, based on an oral motion made by Boykin. The record contains no briefing and shows no hearing on this issue. Russell then filed a motion objecting to the exam, stating that the day he was supposed to go to trial, March 24, Boykin went to the judge and moved for a mental evaluation without consulting Russell. Russell also asserted ineffective assistance of counsel and speedy trial arguments. His objections were

---

[4] Boykin noted that Russell did not provide the street number of the address, but had given Boykin directions to the house. The address provided is the street number for the house Russell directed Boykin to.

[5] Boykin's motion stated he represented "Jerome White," but it was filed in Russell's cause number and had facts corresponding to Russell's pretrial detention.

overruled without explanation. Russell would languish in jail for more than nine months waiting to be evaluated on October 6.[6]

On April 8, Russell filed another speedy trial motion. He argued that his "constitutional rights to a speedy trial had already been violated long before the attorney appointed to me by this court unreasonably motion and court order was granted for me to be mentally evaluated." He added, "of course I've suffered a great amount of anxiety and concern which is the main reason I filed 'Motion for Speedy Trial,'" and noted the unavailability of his alibi witness Ron Ron. Russell continued to file handwritten motions to assert that his rights to a speedy trial and effective assistance of counsel had been violated. Those were filed on April 14, May 6, May 27, and December 1, 2008, as well as on January 5, 2009.[7]

Russell's trial commenced on January 27, 2009. Russell arrived with his own views about how to defend himself. Boykin said his client "has done some extensive research" and

---

[6] As the State explained on the first day of trial, the mental examination concluded that "[Russell] is prepared to go to trial, that he understands and can assist his lawyer, and that he was not M'Naughten insane at the time, and that he did understand right from wrong and appreciates the nature and consequences of his actions." Docket 9-2 at 8-9. Russell's prior filings clearly show a man who wanted at least three things: a speedy trial, his due process rights protected, and equal protection of law. If there was any doubt that Russell was suffering from a mental defect, that doubt was infinitesimal.

[7] How many times does a defendant have to ask for, plead, demand, and beg the Court for enforcement of his constitutional right to a speedy trial? The answer, the Court supposes, is to never give up and to keep asking until the court grants you the relief for which you've prayed.

"is going to want to speak for himself." Docket No. 9-2 at 16-18.[8] Having received Russell's numerous complaints, however, the trial judge was not impressed and indeed appeared to have been aggravated. Eventually he said, "I want that clear. You are not to speak, say another word." Docket No. 9-2 at 17.

Russell's attorney renewed his motion to dismiss for a speedy trial violation. Recall that in December 2007, the judge had denied that motion because it was premature; not enough time had elapsed, he thought, for a speedy trial violation to have occurred.[9] Fourteen months later, though, the judge thought Russell had waited too long to raise a speedy trial problem. "Why are we waiting a year before bringing this up before the Court on the day of the trial?" Docket No. 9-2 at 24.

---

[8] Based on a review of the various motions Russell presented to the trial court, it is clear to this Court that Russell was quite capable. His motions were crafted with sophistication particularly in explaining how his right to a speedy trial had been violated. He invoked both his statutory right to speedy trial and those right secured under our federal constitution. *See, e.g.*, Docket No. 9-1 at 27 (discussing the Sixth Amendment to United States Constitution and also directing the trial court the Mississippi's statutory right to speedy trial.) and 31-33 (same).

[9] The court clearly limited its focus on whether Russell had been denied his statutory right to a speedy trial. Citing Mississippi Code § 99-17-1, the judge concluded that Russell's trial date "is clearly within the statutory time of 270 days from the date of his arraignment." Docket No. 9-1, at 19. Though the court noted that its order was sparked by Russell's "Pro Se Motion to Dismiss for Lack of Speedy Trial," it made no mention of Russell's agonizing plea that his lawyer had not contacted him or provided him with the "legal representation I need to ensure me with due process and equal protection of the law." *Id.* at 59.

On the merits, Boykin argued that Russell had been denied a speedy trial between his December 2006 arrest and the end of February 2008, when he was provided with a functioning attorney—one who would meet and talk with him. Boykin said that the length of time was presumptively prejudicial, that his client had "experienced the anxiety and the oppressive incarceration which inmates obviously experience during their period of incarceration," and that the State had not met its burden to beat back the presumption of prejudice. At some point during this argument, the judge ordered Russell removed from the courtroom.

Boykin continued. He argued that, regarding prejudice, Russell was prepared to testify that "at one time he did have the name and phone number of a witness but that due to the length of time that he was without an attorney during the period of time, he either lost the telephone number, forgot the name." The court denied the motion.

Russell then made a proffer. He testified that he had the telephone number of his alibi witness Ron Ron, who had been staying at Ron Ron's girlfriend's house at the time of the shooting; that he had been communicating with Ron Ron at that number for eight or nine months while awaiting trial; and that "[w]e was waiting to hear from an attorney or the court to provide him with the information that he needed to do to represent me or testify in my behalf," but "after about eight or nine months of incarceration [Ron Ron] and his girlfriend broke up and the phone came disconnect. So I was unable to no longer contact Ron Ron through that phone. So I lost contact of him." Docket No. 9-2 at 55. Russell confirmed that Boykin "is the first attorney I talked to since that preliminary hearing" and that he had not been sent any court order in his

12

case during the time period he had no contact from an attorney.

The judge overruled Russell's arguments and submitted the case to the jury. The jury found him guilty on both counts in the indictment.

On January 30, 2009, during the sentencing portion of Russell's trial, the government again moved to amend the indictment to seek a sentence enhancement as a habitual offender. The judge permitted it.[10] The judge then sentenced Russell to two concurrent life terms without the possibility of parole.

Russell filed his direct appeal. While that was pending, he also asked the Mississippi Supreme Court for leave to proceed in the trial court with a motion for post-conviction relief. The Mississippi Supreme Court denied the application without prejudice for lack of jurisdiction. On August 16, 2011, the Mississippi Court of Appeals affirmed Russell's convictions and sentence. *See Russell I*, 79 So. 3d at 529. On July 27, 2012, Russell filed a second motion for post-conviction relief, which was denied by the Mississippi Supreme Court on February 13, 2014 in an unpublished order. *Russell II.*

Russell seeks federal habeas relief under 28 U.S.C. § 2254. The Magistrate Judge entered a Report and Recommendation proposing to deny relief. Deeply troubled about the perceived constitutional shortcomings meted out against Russell, this Court appointed Russell an attorney to review the record and

---

[10] In its February 11, 2014, order denying post-conviction relief, the Mississippi Supreme Court held that this motion was not timely filed and should have been denied. However, the court found that the error was harmless, since the State's first motion to amend the indictment to allege that Russell was a habitual offender, dated March 10, 2008, was timely.

file an amended objection to the R&R. Oral argument was then held on October 19, 2017.

## II.    Standard of Review

The legal standard is codified at 28 U.S.C. § 2254, as part of the Anti-Terrorism and Effective Death Penalty Act (AEDPA). This statute provides in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

14

28 U.S.C. § 2254(d)-(e).

Under this statute, where the state court has adjudicated the petitioner's claim on the merits, this Court reviews questions of fact under § 2254(d)(2), and reviews questions of law or mixed questions of law and fact under § 2254(d)(1). Factual findings are presumed to be correct, and the reviewing court defers to the state court's factual determinations. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Under the first prong, the clauses "contrary to" and "unreasonable application of" are independent bases for granting habeas relief. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is "contrary to" federal law if it contradicts Supreme Court precedent or reaches a different result on materially indistinguishable facts. *Id.* Under the "unreasonable application" clause, a federal court may grant relief if the state court "correctly identifies the governing legal principle" but "unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002). The state court's decision must be objectively unreasonable, not merely erroneous or incorrect. *Wood v. Allen*, 558 U.S. 290, 301 (2010).

AEDPA's second prong requires that federal courts defer to a state court's factual determinations unless they are based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Morales v. Thaler*, 714 F.3d 295, 301 (5th Cir. 2013). "Even in the context of federal habeas," however, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was

15

unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Id.*; *cf. Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) (reversing state trial court's findings on direct appeal, despite the "great deference" those findings are ordinarily owed). AEDPA "preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." *Richter*, 562 U.S. at 102.

Courts should always be mindful that "habeas itself is based on important liberty interests." *Atkins v. Hooper*, 979 F.3d 1035, 1044 (5th Cir. 2020). The right to be brought to trial to face charges brought by the State is one such important liberty interest. So important that the framers of the Constitution enshrined it in the Sixth Amendment, between the right to due process and the right to be tried by a jury of one's peers.[11]

### III.    Analysis

### A.    Russell's Speedy Trial Claim

Russell was arrested on December 21, 2006; indicted on August 16, 2007; arraigned on November 9, 2007; and brought to trial on January 27, 2009. For these 768 days, Russell, cloaked with the presumption of innocence, remained jailed at the Hinds County Detention Center.

---

[11] The Sixth Amendment also provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. Whether that portion of the Sixth Amendment was violated will be discussed following the discussion of the speedy trial claim.

A defendant's Sixth Amendment right to a speedy trial "attaches at the time of arrest or indictment, whichever comes first." *Dillingham v. United States*, 423 U.S. 64, 65 (1975). In *Barker v. Wingo*, the Supreme Court explained that this right serves three interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." 407 U.S. 514, 532 (1972).

To determine whether a defendant's right to a speedy trial has been violated, courts balance four factors: "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to speedy trial, and (4) the prejudice to the defendant." *Goodrum v. Quarterman*, 547 F.3d 249, 257 (5th Cir. 2008) (citing *Barker*, 407 U.S. at 530); *see also Leachman v. Stephens*, 581 F. App'x 390 (5th Cir. 2014)).

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

*Barker*, 407 U.S. at 533.

17

"[O]rdinarily the burden is on the defendant to demonstrate prejudice. But where the first three factors together weigh heavily in the defendant's favor, we may conclude that they warrant a presumption of prejudice, relieving the defendant of his burden." *Amos v. Thornton*, 646 F.3d 199, 208 (5th Cir. 2011). "This four-factor balancing test eschews 'rigid rules' and 'mechanical factor-counting' in favor of 'a difficult and sensitive balancing process.'" *Id.* at 205. As the Supreme Court explained, the right to a speedy trial "is a more vague concept than other procedural rights," and it is "impossible to determine with precision when the right has been denied . . . . [A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Barker*, 407 U.S. at 521-22.

When a speedy trial claim is presented to a federal court on habeas review, AEDPA "requires us to give the widest of latitude to a state court's conduct of its speedy-trial analysis." *Amos*, 646 F.3d at 205.

### 1. *Barker*'s First Factor: Length of Delay

"The first *Barker* factor . . . consists of a two-part inquiry." *Goodrum*, 547 F.3d at 257. "First, the delay must be extensive enough to give rise to a presumption of prejudice that triggers examination of the remaining *Barker* factors." *Id.* Specifically, courts have decided that a 12-month delay is needed to trigger an analysis of the *Barker* factors.[12] *Id.* Second, if the petitioner shows that his delay exceeds this threshold, "the court must examine the extent to which the delay extends beyond

---

[12] There is no constitutional or statutory text establishing 12 months as the critical threshold. It appears to be a form of judicial triage.

the bare minimum required to trigger a *Barker* analysis, be-cause 'the presumption that pretrial delay has prejudiced the accused intensifies over time.'" *Id.* at 258 (quoting *Doggett v. United States*, 505 U.S. 647, 652 (1992)).

In this case, the Mississippi appellate court correctly found "that Russell's trial occurred a little more than two years after his arrest; therefore, the delay is presumptively prejudicial, and the remaining *Barker* factors must be considered." *Russell I*, 79 So. 3d at 537. The court did not, however, address the second function of this *Barker* factor: the extent of the delay. "The longer the delay between indictment and trial extends beyond the bare minimum, the heavier this factor weighs in a defendant's favor. *Speer v. Lumpkin*, 824 F. App'x 240, 245 (5th Cir. 2020) (citing *United States v. Molina-Solorio*, 577 F.3d 300, 305 (5th Cir. 2009)). According to the Fifth Circuit, "[a] delay must persist for at least eighteen months over and above that bare minimum"—*i.e.*, the delay must exceed two-and-a-half years—"for this factor to strongly favor the accused." *Amos*, 646 F.3d at 206-07. In *Leachman*, for example, a delay of either 24 or 27 months caused the first *Barker* factor to "weigh against the state, though not heavily." 581 F. App'x at 403.

In line with this precedent, the 25-month delay between Russell's arrest and trial makes this factor "weigh against the state, though not heavily." *Id.*[13] On direct appeal, the state

---

[13] A two-year delay may not seem harmful to judges tasked with the re-sponsibility of overseeing a daily docket of many defendants, some of whom are guilty. But, one must always remember that those who are wait-ing on their day in court are presumed to be innocent. And, in fact, many are innocent. For this reason, this Court is disheartened that the courts have determined that a two-year delay weighs only slightly in favor of a defendant. As this Court has lamented, "We believe that innocent people

19

court did not explain how this factor should be considered. The correct conclusion is that this factor weighs against the state and slightly in Russell's favor. *See Laws v. Stephens*, 536 F. App'x 409, 412 (5th Cir. 2013) (holding that a delay of 23 months only weighs slightly in defendant's favor).

### 2. *Barker*'s Second Factor: Responsibility

The second *Barker* factor primarily considers "which party is more responsible for the delay." *Id.* at 413. The Fifth Circuit has stated:

> At one extreme, the deliberate delay to disadvantage the defense is weighted heavily against the state. At the other end of the spectrum, delays explained by valid reasons or attributable to the conduct of the defendant weigh in favor of the state. Between these extremes fall unexplained or negligent delays, which weigh against the state, "but not heavily."

*Goodrum*, 547 F.3d at 258 (citations and quotation marks omitted).

"*Barker* instructs that 'different weights should be assigned to different reasons,' and in applying *Barker*, we have asked 'whether the government or the criminal defendant is more to blame for th[e] delay." *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)

---

should not be punished unless and until they are convicted of a crime. Forcing someone to stay in lengthy pretrial detentions is essentially punishment." *Patterson v. Hinds County, Miss.*, No. 3:13-CV-432-CWR-FKB, 2016 WL 7177762, at *2 (S.D. Miss. June 10, 2016) (quotation marks and citation omitted). The Supreme Court itself found that "[m]ost jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time." *Barker*, 407 U.S. at 532-33.

(quoting *Barker*, 407 U.S. at 531 and *Doggett*, 505 U.S. at 651). While "[d]eliberate delay 'to hamper the defense' weighs heavily against the prosecution," *id.*, "[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant." *Barker*, 407 U.S. at 531; *see Doggett*, 505 U.S. at 657 ("And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows."). Regarding systemic causes for delays, the Supreme Court has stated that "[d]elay resulting from a systemic 'breakdown in the public defender system,' could be charged to the State." *Brillon*, 556 U.S. at 94 (citation omitted).[14]

In this case, Russell's trial was initially set for March 24, 2008. On December 21, 2007, the state court denied Russell's *pro se* motion for speedy trial, but advanced the trial date to February 11, 2008. The trial did not occur on that date. Why? Because Russell advised the court that he had had zero contact with an attorney since his preliminary hearing in January 2007. That claim is not disputed. When Russell finally had his trial on January 27, 2009, the state court stated that "the trial did not commence [on February 11, 2008] as Russell was

---

[14] This is the worst form of a "breakdown" in the system. Here, the Court appointed the Hinds County Public Defender to represent Russell. And that lawyer failed to talk to, communicate with, visit, or have any contact with the defendant, and for months Russell wrote the court, but the court turned a deaf ear and blind eye to his pleas.

complaining of his Public Defender and demanding new counsel which he was given." Docket No. 9-2 at 42.

On direct appeal the state appellate court weighed this factor as "neutral." *Russell I*, 79 So. 3d at 538. It found that "Russell made the request for new counsel and also requested a mental evaluation, resulting in a delay of the trial date in order to accommodate these requests." *Id.* at 537.

The state court's reasoning on this factor runs contrary to two strands of Supreme Court precedent. To the extent that the egregious lack of counsel was due to negligence, *Barker* holds that "negligence or overcrowded courts" are circumstances where "the ultimate responsibility . . . must rest with the government rather than the defendant." *Barker*, 407 U.S. at 531. And in *Brillon*, the Supreme Court held "[t]he general rule attributing to the defendant delay caused by assigned counsel is not absolute. Delay resulting from a systemic 'breakdown in the public defender system' could be charged to the State." 556 U.S. at 94.

In *Brillon*, the defendant waited three years for trial. In that time, he had at least six lawyers. 556 U.S at 85. The Vermont Supreme Court vacated Brillon's conviction for lack of a speedy trial, attributing to the state delays caused by "the failure of several assigned counsel . . . to move his case forward." *Id.* at 91-92. The U.S. Supreme Court reversed the state court because, while delays due to "institutional breakdown" could be attributed to the state, *id.* at 86, 94, in Brillon's case the delays were caused by Brillon himself. Brillon fired his first lawyer on the eve of trial. His second lawyer withdrew due to a conflict. The third lawyer withdrew after Brillon threatened the lawyer's life. Brillon moved to dismiss the fourth lawyer; the fifth lawyer withdrew on his own; and the sixth lawyer

22

finally took Brillon's case to trial. 556 U.S. at 85-88. The Court held that the Vermont Supreme Court should have taken "into account the role of Brillon's disruptive behavior in the overall process." *Id.* at 92.

Unlike Brillon, Russell did nothing to interrupt his case; instead, the delays were entirely due to institutional breakdown. The Hinds County Public Defender's office left Russell without a lawyer for 14 months. Russell himself alerted the state court to the fact he had had no contact with a lawyer. *See* Docket No. 9-10 at 59.[15]

The state courts were wrong to characterize Russell's claim as if he had had a disagreement with his attorney—a factor which ordinarily can be held against a defendant. That isn't what happened here. Russell's November 2007 motion asserted that he had never seen or communicated with a lawyer since his preliminary hearing. *See* Docket No. 9-10 at 59 ("I've been held in (11) months of unconstitutional detention . . . and a lawyer has not yet contacted me and provided me with due process and legal representation [sic] I need"). The record instead shows that Russell had frequently begged the trial court for help.[16] The public defender failed to take any action. But, more importantly, the trial court failed to take any action.

A more difficult question arises from the nearly seven-month delay caused by Russell's mental evaluation. Delay caused by

---

[15] The fact that the record does not reflect what the trial court did once being placed on notice that Russell's lawyer neglected him for so many months suggests that this was an institutional breakdown and not just incompetence or neglect by the lawyer.

[16] He begged for due process. He begged for equal protection of the law. He begged for a trial. *See, e.g.,* Docket No. 9-1 at 34, 44.

court-ordered mental evaluations is ordinarily not assessed against the state. This principle is for a good reason: defendants who may not be aware of what they did, or the nature of the proceedings, may lack the capacity to waive their speedy trial right for the pendency of the evaluation process. The Mississippi appellate court's general observations to this effect, *see Russell I*, 79 So. 3d at 537, were correct.

The problem in Russell's case specifically lies in the fact that we have no record of why a mental examination was requested—or why one was granted. Russell had no opportunity to weigh in or even be present while his mental health was being discussed. He objected to the examination at the first opportunity.

A more cynical observer might think that a mental examination was the easiest way to get Russell's case off the docket, or perhaps to keep him incarcerated for months more on end without the speedy trial clock running.[17] But even a neutral observer should be concerned with why the record is silent on such an important issue.

In any event, even setting aside how the mental evaluation delay is construed, the delay in this case during the 14-month period where Russell had no access to a lawyer falls squarely on the shoulders of the Hinds County Public Defender's office *and* the trial court. The complete absence of counsel constitutes "a systemic 'breakdown in the public defender system.'" *Brillon*, 556 U.S. at 94 It was objectively unreasonable for the

---

[17] It is well-known that Hinds County defendants face long delays in receiving a mental evaluation.

Mississippi Court of Appeals to weigh this factor as neutral. This factor should have been weighed against the state.

### 3.    *Barker*'s Third Factor: Petitioner's Diligence

*Barker*'s third factor instructs courts to look at the defendant's diligence in asserting his speedy trial rights.

"*Barker* instructs that '[t]he defendant's assertion of his speedy trial right . . . is entitled to *strong evidentiary weight* in determining whether the defendant is being deprived of the right.'" *Goodrum*, 547 F.3d at 259 (quoting *Baker*, 407 U.S. at 531-32) (emphasis in original). "This is because the vigorousness with which a defendant complains about the delay will often correspond to the seriousness of the deprivation."[18] *Goodrum*, 547 F.3d at 259 (citing *Baker*, 407 U.S. at 531-32). "[W]e have applied these clearly articulated principles from *Barker* and construed vigorous and timely assertions of the right to speedy trial as weighing strongly or heavily in the defendant's favor." *Id.*

As in *Goodrum*, the state court record shows that Russell "doggedly invoked his speedy trial right," 547 F.3d at 260. He first asserted his speedy trial right on May 2, 2007, and continued

---

[18] This is a dubious assumption. We know detainees come in all forms. Some detainees face psychological or intellectual difficulties in asserting their constitutional rights. Others may face hurdles getting their complaints through the prison mail system. But, these are reasons why they have counsel. Counsel is provided so that these rights are claimed and asserted. The courts are there to make sure these rights are safeguarded. Irrespective of the vigor in which a defendant pursues a speedy trial, the State should jealously guard the constitutional rights of those it seeks to bring to trial. But, the law is what it is.

to file motions seeking to obtain a speedy trial.[19] The timeliness of Russell's assertions should be notable, as the Fifth Circuit has stated, "'the point at which the defendant asserts his right is important because it may reflect the seriousness of the personal prejudice he is experiencing.'" *Robinson v. Whitley*, 2 F.3d 562, 569 (5th Cir. 1993) (quoting *United States v. Palmer*, 537 F.2d 1287, 1288 (5th Cir. 1976)).

On direct appeal, the state court made no express finding regarding this factor. This is contrary to Supreme Court precedent. "Under the Supreme Court's precedent in *Barker*, [defendant]'s persistent invocation of the right must weigh strongly in his favor and hence, the state court's failure to accord due weight to this factor is contrary to clearly-established law." *Goodrum*, 547 F.3d at 260.

---

[19] Russell wrote on November 15, 2007, in a motion that "I have been held in (11) months of unconstitutional detention as an innocent accused without bond, suffering from mental anxiety and concern from oppressive pretrial incarceration, and a lawyer has not yet contacted me and provided me with the legal representation [sic] I need." Docket No. 9-10 at 59. On December 21, 2007, Russell wrote in a motion that he had been held in custody without bond for a year and "I'm suffering mental anxiety and concern from the oppressive pretrial detention." Docket No. 9-1 at 22. On January 7, 2008, Russell wrote that he was "deprived from the 6th amend [sic] right to speedy trial and the effective assistance of counsel." *Id.* at 35. On February 13, 2008, Russell wrote "I didn't even go to court Febuary [sic] 11, 2008, not haveing [sic] to mention actuelly [sic] going to trial on that date, nor have a lawyer has come to visit me since my arrest." *Id.* at 44. Very few things should get a trial court's attention more than a jailed criminal defendant's plea that he has not seen or spoken with his attorney. Such a shocking statement should not be one the court is accustomed to hearing.

26

### 4.    *Barker*'s Fourth Factor: Prejudice

The fourth and final element asks whether Russell was prejudiced by the delay. The state court found this issue "without merit." *Russell I*, 79 So. 3d at 539. But what does the Supreme Court say?

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. . . . : (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.

*Barker*, 407 U.S. at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Speer*, 824 F. App'x at 245 (citing *Barker*, 407 U.S. at 532). "If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall events of distant past accurately. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." *Barker*, 407 U.S. at 532.

The Court will analyze whether Russell was actually prejudiced regarding the aggravated assault charge first, and then the felon in possession charge.

### a.    Aggravated Assault Charge

The "heart of the prejudice inquiry" is whether the delay impaired the defense. *Speer*, 824 F. App'x at 246. Here, the government's failure to provide Russell with an attorney and a timely trial impaired his ability to present his alibi defense on

27

the aggravated assault charge. The delay caused Russell to lose contact with an exculpatory witness. "This is exactly the type of prejudice the Supreme Court was most concerned with in *Barker*." *United States v. Frye*, 489 F.3d 201, 213 (5th Cir. 2007).

This is a case where no one saw the actual aggravated assault. Russell only had one person who could help him adequately prepare his case: the man who took him away from the scene before the shooting.[20] Russell explained in the proffer that that man, Ron Ron, would have testified "[t]hat he came and picked me up from the same location the victim is supposed to have got shot from a minute before he got shot. . . . When he came and picked me up wasn't nobody shot from that location." Docket No. 9-2 at 55. This is not a "general allegation of loss of witnesses," *United States v. Zane*, 489 F.2d 269, 270 (5th Cir. 1973), but a specific assertion of a particular, specified and named lost witness made under oath.

Russell took all the steps available to him while incarcerated in Hinds County Detention Center, with no assistance or visit from an attorney in 14 months: he diligently called the number of Ron Ron's then-girlfriend's home, testifying that he knew how to contact Ron Ron at the time of arrest: "I had his girl's home number. And after about eight or nine months of incarceration him and his girlfriend broke up and the phone came disconnect. So I was unable to no longer contact Ron Ron through that phone. So I lost contact of him." Docket No. 9-2 at 55. Russell also disclosed his witness immediately upon obtaining counsel, showing the proper diligence we should

---

[20] Technically, there was another who could help him: his attorney. But that person did not exist.

expect from persons raising an alibi defense. By that time, though, it was too late.[21]

This is also not a case where the evidence of guilt was abundant. *See, e.g.*, *United States v. Hendricks*, 661 F.2d 38, 42 (5th Cir. 1981). None of the government's witnesses, including the victim himself, identified Russell as the perpetrator. The only evidence linking Russell to the crime of aggravated assault was that he was at the same gathering as the victim; the victim claimed Russell carried a 9mm in his waistband—the same type of gun that the *victim* always had in his car—which Russell denied; and walked outside around the same time as the victim. No ballistics tests were done linking the shell casings at the scene to Russell.

The Mississippi Court of Appeals dismissed Russell's claim of prejudice in two cursory sentences, stating "the record supports the State's argument that Russell admitted on cross-examination that he never knew Ron Ron's last name.[22] We find Russell's claim of prejudice to lack support." Docket No. 8-1 at 9. The court claimed to draw support from two cases, *Birkley v. State*, 750 So. 2d 1245, 1252 (Miss. 1999) and *Perry v. State*,

---

[21] This is the exact concern the *Barker* Court spoke about: "if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defenses." 470 U.S. at 533.

[22] In contrast, the trial court accepted testimony from the prosecution's witnesses who referred to people by nicknames. The victim, Michael Porter, did not know the name of his then-girlfriend's mother—another person at the scene—stating "I'm used to calling her mama." Docket No. 9-3 at 92. Vicki Hawkins referred to the victim by his nickname "Fox." *Id.* at 124.

637 So. 2d 871, 876 (Miss. 1994). Neither case is a speedy trial case involving a claim of prejudice due to a missing witness.

In the briefing in this matter, the government contends that Russell "fails to demonstrate that this mysterious 'alibi witness' would actually provide an alibi as he claims." Docket No. 25 at 8. The argument doesn't acknowledge the record evidence: that Russell knew Ron Ron for five years, that Russell was able to contact him for eight months while incarcerated, that Russell could specifically state the contents of Ron Ron's testimony, that Russell did so immediately upon obtaining counsel; and that Russell was able to provide a nickname, a telephone number, and directions to an identifiable residence. The government also does not acknowledge that the trial court prevented Russell from explaining to the jury that Ron Ron was on standby to be a witness, but that Russell lost contact with him when he was incarcerated for 14 months without access to a lawyer. *See* Docket No. 9-4 at 36.

The government then speculates about the impact Ron Ron's testimony would have had in the trial, stating "the testimony presented by other witnesses at trial called into question Russell's alibi such that the only effect of any testimony presented by 'Ron Ron [no last name]' would have transformed Russell's alibi from an incredibly tall tale to just a tall one." Docket No. 25 at 8.[23] The government cites *Cowart v. Hargett*, 16 F.3d

---

[23] It's bad enough that the government failed to bring the defendant to trial within a constitutionally permissible time frame, but here, in its habeas arguments, it proposes to act as a jury too. The State's conjecture fails to recognize that had Russell received his speedy trial, Ron Ron may have testified at trial. The *jury* could have weighed his testimony with and against the other witnesses. The jury could have concluded that it was the other witnesses who were telling an incredibly tall tale. The task of

642, 648 (5th Cir. 1994) as support for this claim. There, the Fifth Circuit found that the petitioner did not experience actual prejudice due to a missing witness named "Peanuts" because the "failure of Peanuts's testimony could not have altered the outcome of the trial and [thus] could not have resulted in actual prejudice to Cowart." *Id.* at 648.

The case is plainly inapposite. In *Cowart*, the petitioner alleged that Peanuts would have testified that he and the petitioner did not go to the victims' home with the intention of committing a crime. But "[t]heir purpose for going to the [victims'] house, however, is immaterial to the crimes that transpired upon arrival." *Id.* at 648. Additionally, the Fifth Circuit found that even if Peanuts' testimony was material, it was not likely to have impacted the outcome of the trial in light of the overwhelming evidence at trial. *Id.* at 648. This evidence included positive identification of the petitioner by the victims, who testified that they had known the petitioner for several years and easily identified him as the assailant. Brief of Respondents/Appellants at *9, *Cowart v. Hargett*, 16 F.3d 642 (5th Cir. 1994) (No. 92-7804) At trial, the defense rested its case without presenting any witnesses. *Id.*

In contrast, the record in this case reveals a high probability that Ron Ron's testimony would have altered the outcome of the trial on the aggravated assault charge. As discussed above, Russell's conviction rested on no eyewitness testimony. Unlike in *Cowart*, not a single witness saw Russell shoot the victim—not even the victim himself. According to

---

determining what evidence to believe and not to believe is left to the jury, not for the prosecution to offer utter speculation in defense of these woefully inadequate trial proceedings.

only the victim, Russell may have been carrying the same type of gun that was used in the shooting, a fact that might incriminate him for the felon-in-possession charge. But the victim was also carrying this type of gun. Ron Ron's testimony would have established that Ron Ron picked Russell up before the shooting occurred, making it impossible for Russell to have committed the aggravated assault. Not only did Russell not have Ron Ron to provide an alibi, at his trial, Russell was prevented from explaining to the jury that his alibi witness was on standby to testify, but that he lost contact with him after eight months of calling because he was incarcerated without access to a lawyer for 14 months. *See* Docket No. 9-2 at 36.

The government then claims support from *Tarver v. Banks*, 541 F. App'x 434, 437 (5th Cir. 2013). In *Tarver*, the petitioner admitted that he did not know how his two allegedly missing witnesses would have impacted the case. *Id.* at 437. The petitioner also did not know the names of the potential witnesses. *Id.* Russell's testimony indicates that he does know how Ron Ron would have impacted the case. Additionally, as stated above, Russell was able to provide a name, a telephone number, and directions to a known place of residence.

Finally, Russell was timely in seeking out his alibi witness and has shown the alibi witness would have aided his defense, unlike in *Robinson v. Whitley*, 2 F.3d 562, 571 (5th Cir. 1993), another case relied upon by the government. In *Robinson*, the defendant waited for years to try to locate alibi witnesses, and his alibi defense was destroyed by the defendant's own testimony. As discussed above, Russell made all the attempts he could from his incarcerated position to secure Ron Ron as a witness: he called diligently for months and alerted his public

defender at the preliminary hearing, who brushed him off and never contacted him again. The record reflects that Russell's later attorney Boykin tried to find Ron Ron, but it was too late.

The prejudice inquiry also asks about more subjective harms to a defendant. The Court now turns to these.

The record is full of Russell's motions attesting to anxiety and concern.

"I have been held in (11) months of unconstitutional detention as an innocent accused without bond, suffering from mental anxiety and concern from oppressive pretrial incarceration, and a lawyer has not yet contacted me and provided me with the legal representation [sic] I need," Russell wrote on November 15, 2007. Docket No. 9-10 at 59. On December 21, 2007, Russell told the court that he had been held in custody without bond for a year and "I'm suffering mental anxiety and concern." Docket No. 9-1 at 22. A month later, he said that he had been "deprived from the 6th amend [sic] right to speedy trial and the effective assistance of counsel." *Id.* at 35. Then, on February 13, 2008, Russell explained that he "didn't even go to court Febuary [sic] 11, 2008, not haveing [sic] to mention actully [sic] going to trial on that date, nor have a lawyer has come to visit me since my arrest." *Id.* at 44.

The Mississippi Court of Appeals dismissed Russell's assertion that he "suffered mental anxiety" by citing *Jenkins v. State*, 947 So. 2d 270 (Miss. 2006). In that case, the court held that "a defendant's assertion of prejudice attributable solely to incarceration, with no other harm, typically is not sufficient to warrant reversal." *Id.* at 277. Just prior to that sentence, the Mississippi Supreme Court also stated, "Mississippi case law

33

does not recognize as prejudice the negative emotional, social, and economic impacts that accompany incarceration." *Id.* Yet that is flatly contrary to federal law. In *Goodrum*, the Fifth Circuit said it had "already noted *Barker's* recognition of anxiety and concern of the accused as a type of **cognizable harm** that may result from a delayed trial **and other cases stress its independence from whatever impact the delay may or may not have on the defense**." 547 F.3d at 262-63 (emphasis added). The Fifth Circuit found unreasonable the state court's rejection of the defendant's anxiety and concern as probative of prejudice. *Id.* at 263. The same conclusion is warranted here.

The context of Russell's detention also should not be overlooked. Russell was imprisoned for 25 months at a facility known as "a troubled jail," one known for "rampant prisoner-on-prisoner violence, . . . homicide[,] and a remarkable volume of contraband." *Patterson v. Hinds Cty., Miss.*, No. 3:13-CV-432-CWR-FKB, 2016 WL 7177762, at *9 (S.D. Miss. June 10, 2016) (quoting U.S. Dep't of Justice, Justice Department Finds That Hinds County Mississippi, Fails to Protect Prisoners from Harm and Detains Prisoners Beyond Court-Ordered Release Dates (May 21, 2015)).[24] It is little wonder that Russell wrote motion after motion pleading for an attorney.

---

[24] *See also United States v. Hinds County*, No. 3:16-CV-489-CWR-JCG (S.D. Miss. Jan. 16, 2020) [Docket No. 60] ("Regretfully, despite more than three years having passed, Hinds County has yet to reach compliance with the Consent Decree [with the Department of Justice approved by this Court]."); Mollie Bryant, *Jailed without trial*, THE CLARION-LEDGER, Oct. 29, 2016 (describing Hinds County Detention Center as "a jail that has become notorious for its abysmal conditions").

In sum, Russell suffered actual prejudice. The government's delay in bringing his case to trial caused Russell to lose his alibi witness on the aggravated assault charge and experience oppressive pretrial incarceration and anxiety. The Mississippi appellate court's disregard for that evidence was contrary to longstanding federal law. Thus, it was objectively unreasonable not to find that Russell was prejudiced.

### b.        Felon in Possession Charge

In contrast to the aggravated assault charge, there is not sufficient evidence of actual prejudice for the felon in possession charge. While Russell experienced the same anxiety from being incarcerated for an extended period without counsel, Russell's defense for the felon in possession charge was not prejudiced by the delay like the aggravated assault charge. At trial, there was more evidence for the felon in possession charge: it was not contested that Russell was a convicted felon, and there was eyewitness testimony indicating that Russell was carrying a firearm. *See* Docket No. 9-3 at 94-95, Docket No. 9-6 at 15. Ron Ron was only described as an alibi witness for the aggravated assault charge. Like in *Cowart*, Ron Ron's testimony likely "could not have altered the outcome of the trial" on the felon in possession charge, and thus Russell's defense did not suffer actual prejudice on that charge. 16 F.3d at 648.

### 5.        Balancing the *Barker* factors

"We now come to the determinative question: whether the state court unreasonably concluded that the balance of all four *Barker* factors in this case does not establish a violation of the speedy trial right." *Goodrum*, 547 F.3d at 266.

The Supreme Court in *Barker* said that none of the four factors are "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors **and must be considered together with such other circumstances as might be relevant**." *Barker*, 407 U.S. at 533 (emphasis added). "The speedy trial inquiry therefore involves a 'difficult and sensitive' balancing of these factors under the particular circumstances of a given case" *Goodrum*, 547 F.3d at 257.

In the present case, standing alone, the 25-month delay between Russell's arrest and trial would not be considered an outlier worthy of relief in light of Supreme Court and Fifth Circuit precedent excusing delays as long as five and seven years. *See Barker v. Wingo*, 407 U.S. 514 (1972) (five years); *Boyer v. Vannoy*, 863 F.3d 428 (5th Cir. 2017) (seven years). However, the inquiry must not end there. "What is acceptable in one case . . . may not be so in another; much depends on the complexity of the case." *Gray v. King*, 724 F.2d 1199, 1202 (5th Cir. 1984). Notably, in *Barker*, the Supreme Court stated in a footnote, "[f]or example, the First Circuit thought **a delay of nine months** overly long, absent a good reason, **in a case that depended on eyewitness testimony**." 407 U.S. at 531 n.31 (citing *United States v. Butler*, 426 F.2d 1275, 1277 (1st Cir. 1970)) (emphasis added).

The circumstances of this case can be summed up as follows. The 25-month delay between Russell's arrest and trial weighs against the state, though not heavily. The responsibility for the majority of that delay falls on the state, as the government failed to provide Russell with an attorney for more than a year. Russell diligently and repeatedly invoked his speedy trial right—a factor that provides strong evidentiary support

36

for speedy trial claimants. And most importantly, the delay prejudiced not only Russell's mental health, but severely impaired his aggravated assault defense, as he lost an alibi witness in a case otherwise based entirely on circumstantial evidence.

The Mississippi Court of Appeals did not explicitly balance the *Barker* factors. Instead, in a cursory fashion, it stated that,

> The record reflects that the circuit judge carefully considered Russell's claims and applied the appropriate judicial tests. Although the circuit judge did not fully articulate his calculations regarding defense delay in his findings, the record shows that the circuit judge spoke to the issue of prejudice and the *Barker* factors; thus, we find that the circuit court's findings are supported by substantial evidence in the record.

*Russell I*, 79 So. 3d at 538-39. The Court of Appeals was mistaken. At trial, the judge discussed only the second *Barker* factor and, regarding that factor, the judge said "this Court should hold this factor to favor **Murray**."[25] Docket No. 9-2 at 37 (emphasis added). The judge then went on to conclude,

> The Court is of the opinion considering all aspects of this case, and particularly the motion, and considering the history, the timeline, the Barker factors, arguments of counsel this morning, briefs of counsel previously submitted to the Court is of the opinion that the [speedy trial]

---

[25] That is not a typo. The judge was mistaken about which defendant was before him.

> motion is not well taken and should be and is
> hereby denied.

Docket No. 9-2 at 43.

The text and structure of AEDPA requires federal deference to state-court findings. Here, though, it is difficult to review such bare-bones findings. It is not apparent that the state court engaged in the delicate and sensitive balancing process that *Barker* requires.

The Supreme Court says "[a] defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process." *Barker*, 407 U.S. at 527. Yet, the State in this case instead argued "statutorily and constitutionally due process matters not." Docket No. 9-2 at 31.

Reading the record as a whole, and giving weight to those factors that the state courts considered following Supreme Court precedent, this is a case where there is a "nexus between the reason for the delay, the delay, and the prejudice," which the Fifth Circuit has held creates a speedy trial violation. *See Frye*, 489 F.3d at 212 (citing *Arrant*, 468 F.2d at 682-84). The delay of 25 months resulted in the actual prejudice of a missing critical witness. The reason for the delay, during the critical time period of 14 months after the arrest, was "a breakdown in the public defender system," reasons which the Supreme Court has held may be charged to the state. *Brillon*, 556 U.S. at 86. When considered together as they must, these factors show that Russell was deprived the fundamental fairness required in our criminal justice system.

As the Supreme Court has instructed, "because we are dealing with a fundamental right of the accused, this process must

38

be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Barker*, 407 U.S. at 533. The state courts, at trial and on direct appeal, acted objectively unreasonably in not considering the state's responsibility for the actual prejudice Russell faced on the aggravated assault charge, prejudice which both undermined the fairness of the system and condemned Russell to a conviction for a shooting no one saw him commit. Thus, for the aggravated assault charge, Russell's speedy trial petition is granted.

However, for the felon in possession charge, the *Barker* factors do not balance in Russell's favor, as he did not suffer actual prejudice. The state court was not unreasonable in rejecting Russell's claim on that charge.

### B.     Russell's Ineffective Assistance of Counsel Claim

Ordinarily, to succeed on an ineffective assistance of counsel claim, the defendant must satisfy the two-part test identified by the Supreme Court in *Strickland v. Washington*: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that that deficient performance prejudiced the defense." 466 U.S. 668, 687 (1984).

However, the Supreme Court's decision in *United States v. Cronic* created a limited *Strickland* exception in situations that "are so likely to prejudice the accused that the cost of litigating their effect in the particular case is unjustified." 466 U.S. 648, 658 (1984). The Court has identified three situations that fit this limited exception. *Bell*, 535 U.S. at 695-96. In each of them, courts will presume that the defendant has been prejudiced. *Id.*

39

"First and '[m]ost obvious' [is] the 'complete denial of counsel.'" *Id.* at 695 (quoting *Cronic*, 466 U.S. at 659). "A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at 'a critical stage.'" *Id.* (quoting *Cronic*, 466 U.S. at 659, 662). Second are situations in which a defendant is represented by counsel at trial, but his or her counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* (quoting *Cronic*, 466 U.S. at 659). Finally, prejudice is presumed when the circumstances surrounding a trial prevent a defendant's attorney from rendering effective assistance of counsel. *Bell*, 535 U.S. at 696 (citing *Powell v. Alabama*, 287 U.S. 45, 57–58 (1932)).

The first *Cronic* situation applies here. "[B]ecause our system of justice deems essential the assistance of counsel, 'a trial is unfair if the accused is denied counsel at a critical stage of his trial.'" *Id.* at 345 (quoting *Cronic*, 466 U.S. at 659). "[A]bsence of counsel at critical stages of a defendant's trial undermines the fairness of the proceeding and therefore requires a presumption that the defendant was prejudiced by such deficiency." *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001).

In the present case, Russell was without an attorney for 14 months while incarcerated pretrial. Several Supreme Court cases demonstrate that the period between the appointment of counsel and the start of trial is indeed a "critical stage" for Sixth Amendment purposes. The *Powell* Court described the pre-trial period as "perhaps the most critical period of the proceedings . . . that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important." 287 U.S. at 57. The Court held that a defendant must be provided counsel at "every step in the proceedings

40

against him." *Id.* at 69. *Bell* confirmed that the "critical stage[s]" at which counsel must be present are not limited to formal appearances before a judge. 535 U.S. at 696 n.3.

The pretrial period constitutes a "critical period" because it encompasses counsel's constitutionally-imposed duty to investigate the case. The Supreme Court has explicitly found that trial counsel has a "duty to investigate" and that to discharge that duty, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The Court also recognized that without pretrial consultation with the defendant, trial counsel cannot fulfill his or her duty to investigate. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.* The Court went on to emphasize further the significance of the defendant's input into trial counsel's investigation:

> In particular, what investigation decisions are reasonable depends critically on such information [provided by defendant]. . . . . In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.* Because the Supreme Court has made clear that there is a duty incumbent on trial counsel to conduct some pre-trial investigation, it necessarily follows that trial counsel cannot

41

discharge this duty if he or she fails to consult with his or her client.[26]

The Sixth Circuit's decision in *Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003) is illustrative. There, Mitchell's counsel did not hold a private meeting with Mitchell during the seven-month period of his representation; Mitchell had only six minutes of contact with his attorney before his trial. 325 F.3d at 744. He was never visited by his counsel while incarcerated pretrial. *Id.* at 746. The Michigan Supreme Court rejected Mitchell's claim for ineffective assistance of counsel, evaluating it under the *Strickland* standard. *Id.* at 741. In doing so, the Sixth Circuit said, "the Michigan Supreme Court erroneously and unreasonably applied clearly established Supreme Court law in *Cronic*." *Id.* Thus, the Sixth Circuit found that the state court's rejection of Mitchell's ineffective assistance of counsel claim was both contrary to and an unreasonable application of clearly established law. *Id.* at 741.

As in *Mitchell*, the Mississippi Supreme Court's application of *Strickland* to this case is an erroneous and unreasonable application of the clearly established Supreme Court law set forth in *Cronic*. It is well-established that the "complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice." *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000) (citing *Cronic*, 466 U.S. at 659). Because Russell was completely denied counsel during the critical

---

[26] Communicating with the client will aid counsel in not only getting the trust of his client, but those communications and consultations may help counsel determine how he may advise his client on whether he should testify or offer evidence in his trial.

pretrial stage, Russell's claims should be evaluated under *Cronic. Id.* at 742.

The record bears out Russell's allegations of complete denial of counsel. Russell's ineffective assistance of counsel claim concerns Frank McWilliams, the public defender who Russell never met, and who was eventually removed by the trial court after Russell had been incarcerated for 14 months. During the period of McWilliams' "representation," from January 8, 2007 until February 28, 2008, Russell was constructively denied counsel. This denial of counsel occurred prior to Russell's scheduled February 11, 2008 trial, which did not occur only because McWilliams never met with Russell.

The fact that Russell technically had appointed counsel—McWilliams—from January 8, 2007 until February 28, 2009 is not a persuasive reason to excuse the constitutional violation. "Assistance begins with the appointment of counsel, it does not end there." *Cronic*, 466 U.S. at 654 n.11. Russell received no assistance during those critical months, even though he had a trial scheduled for February 11, 2008. "The Sixth Amendment guarantees more than a pro forma encounter between the accused and his counsel," *Mitchell*, 325 F.3d at 744, and Russell did not even have a single encounter.

Russell's case does differ from *Mitchell* in that, after 14 months of being completely abandoned by counsel, the trial court finally replaced McWilliams and appointed Boykin, a competent attorney, to represent Russell. But the constitutional violation was cured only in part. Russell lost contact with his alibi

43

witness.[27] Having been without counsel for this extended period of time "affected—and contaminated—the entire criminal proceeding." *Satterwhite v. Texas*, 486 U.S. 249, 257 (1988).

Fifth Circuit law plainly held that during this period, McWilliams should have been preparing for Russell's trial and securing the witness. "[A]n attorney must engage in a reasonable amount of pretrial investigation and "at a minimum, . . . interview potential witnesses and . . . make an independent investigation of the facts and circumstances in the case." *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985). Furthermore, "when alibi witnesses are involved, it is unreasonable for counsel not to try to contact the witnesses and 'ascertain whether their testimony would aid the defense.'" *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (citation omitted). "Informed evaluations of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel." *Washington v. Watkins*, 655 F.2d 1346, 1355 (5th Cir. 1981) (citation omitted). Yet, McWilliams never had a single conversation with Russell. That was constitutional error. *See Towns v. Smith*, 395 F.3d 251, 258-60 (6th Cir. 2005) (recognizing that counsel's failure to conduct reasonable investigation into "known and potentially important alibi witness" was ineffective assistance because investigation would have produced reasonable probability of defendant's acquittal).

---

[27] The trial court even denied Russell's request to explain to the jury why his alibi witness was not there and that he had been without a lawyer for 14 months. Docket No. 9-4, at 36.

While the loss of Russell's alibi witness more greatly hindered Russell's defense for the aggravated assault charge,[28] as discussed in the above speedy trial section, *Cronic*'s presumption of prejudice applies to both the aggravated assault and felon in possession charges. In *Cronic* cases, the defendant is not required to establish that the presence of an attorney at a critical stage "did in fact have an adverse impact on his own fortune or that the presence of his attorney would have improved his chances of an acquittal." *Burdine*, 262 F.3d at 348. "Such a standard would require that the defendant, in effect, prove prejudice in order to receive a presumption of prejudice." *Id.* "That **was not** the standard announced in *Cronic*." *Id* (emphasis added). The Fifth Circuit emphasized:

> To justify a particular stage as "critical," the Court has not required the defendant to explain how having counsel would have altered the outcome of his specific case. Rather, the Court has looked to whether "the substantial rights of **a defendant** may be affected" during that type of proceeding.

*Id.* at 347 (quoting *United States v. Taylor*, 933 F.2d 307, 312 (5th Cir. 1991) (emphasis added). "[T]he overarching legal question of whether a particular proceeding is a "critical stage" of the trial should focus not only on the specific case . . ., but the general question of whether such a stage is 'critical.'" *United*

---

[28] Russell stated that his alibi witness Ron Ron would have testified that Ron Ron picked Russell up before the shooting occurred, thereby making it impossible for Russell to have been the one who shot the victim Porter. It is unclear from the record if Ron Ron would have also testified that Russell did not have a gun. The victim was the only witness to testify that Russell possessed a gun, which Russell denied.

*States v. Robles*, 445 F. App'x 771, 779 (5th Cir. 2011) (quoting *Van v. Jones*, 475 F.3d 292, 313–14 (6th Cir. 2007)). Thus, the determination that Russell was denied counsel at a critical stage applies to both of Russell's charges. At the critical stage in his case, Russell was left to fight for himself, but like any other defendant without an attorney, Russell "lack[ed] both the skill and knowledge adequately to prepare his defense." *Powell*, 287 U.S. at 69.

Because the record establishes a total absence of counsel during a critical period, the Mississippi Supreme Court should have applied *Cronic*, rather than *Strickland*, to Russell's claim. The application of *Cronic* results in finding a constitutional violation sufficient to vacate Russell's convictions. The Mississippi Supreme Court's holding was contrary to and an unreasonable application of clearly established law.

One final word. The Court takes this opportunity to thank counsel for accepting the appointment and for zealously representing Mr. Russell. Counsel has demonstrated all that Russell lacked for more than a year after the criminal proceedings were initiated.

## IV.    Conclusion

The petition is granted. This ruling is stayed pending the State's anticipated appeal.

**SO ORDERED**, this the 24th day of March, 2021.

s/ CARLTON W. REEVES
*United States District Judge*

46